**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ADRIENNE WILLIS, | ) | CASE NO.  1:11-cv-271 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Adrienne Willis ("Plaintiff"), challenges the final decision of Defendant,

Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying

Plaintiff's applications for a Period of Disability ("POD") and Disability Insurance

Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of

the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("the Act").  This Court

has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to the consent of the parties entered under

the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the

Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

On March 29, 2006, Plaintiff filed applications for a POD, DIB, and SSI and alleged a disability onset date of August 31, 2003.  (Tr. 13.)  Her applications were denied initially and upon reconsideration, so she requested a hearing before an administrative law judge ("ALJ").  (Tr. 13.)  On February 3, 2009, an ALJ held Plaintiff's hearing by video conference.  (Tr. 13.)  Plaintiff appeared, was represented by counsel, and testified.  (Tr. 13.)  Plaintiff's father appeared as a witness in support of Plaintiff; and a vocational expert ("VE") also appeared and testified.  (Tr. 13.)

On March 6, 2009, the ALJ found Plaintiff not disabled.  (Tr. 26.)  On December 8, 2010, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)  On February 8, 2011, Plaintiff timely filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)

On September 6, 2011, Plaintiff filed her Brief on the Merits.  (Doc. No. 16.)  On October 18, 2011, the Commissioner filed his Brief on the Merits.  (Doc. No. 17.)  Plaintiff did not file a Reply Brief.

Plaintiff asserts three assignments of error:  (1) the ALJ failed to give appropriate weight to Plaintiff's treating psychiatrists; (2) the ALJ failed to assess the opinions of Plaintiff's counselor properly pursuant to Social Security Ruling 06-03p; and (3) the ALJ's hypothetical question to the VE did not adequately portray Plaintiff's limitations.  Plaintiff also contends that remand is warranted pursuant to sentence six of 42 U.S.C. § 405(g) for a review of new and material evidence.

2

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was 34 years old on her alleged disability onset date.  (Tr. 23.)  She has a least a high school education and is able to communicate in English.  (Tr. 23.)  She has past relevant work experience as an historical interpreter and tour narrator.  (Tr. 34-35.)

### B.   Medical Evidence

#### 1.   Medical Evidence Submitted to the ALJ

On December 17, 2003, Plaintiff presented to Dr. Anthony Smartnick, M.D., upon referral from Ms. Lois Nicholson for a psychiatric evaluation.  (Tr. 266-67.)  Dr. Smartnick indicated that Plaintiff's medical history was "basically unremarkable," and Dr. Smartnick's mental evaluation essentially was normal.  (*See* Tr. 266.)  Dr. Smartnick diagnosed Plaintiff with mildly to moderately severe obsessive-compulsive disorder ("OCD") and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of between 45 and 50.[1]  (Tr. 267.)

Plaintiff continued to treat with Dr. Smartnick through 2005.  (*See* Tr. 271-300.)  On February 8, 2006, Dr. Smartnick authored a letter that indicated the following:

> [Plaintiff] has a longstanding history of anxiety that is secondary to obsessive-compulsive disorder. She has a number of obsessions about germs, getting some terrible disease and dying or being disabled or debilitate by this. She also has a lot of compulsive behavior such as

---

[1] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

3

compulsive hand washing.  In addition, she has a lot of other obsessions about doing or saying the wrong things and she has pathological self doubt. There is significant anxiety and distress associated with this, and this interferes with her concentration and her ability to function.  She has only had a partial response to treatment; specifically, anti-obsession medication. She is on Paxil, 80 mg a day, and she has had a partial response to her ongoing psychotherapy.

This patient was last seen on November 1, 2005.  Because of her significant ongoing residual obsessive-compulsive symptoms and the associated anxiety she is unable to be gainfully employed.  The anxiety is to the extent that it interferes with her ability to focus and attend enough to doing a job, and her symptoms would make her incapable of tolerating interaction with others or the work environment.

(Tr. 256.)

On June 19, 2006, Plaintiff presented to Dr. Donald Levinthal, Ph.D., for a consultative psychological evaluation at the request of the Bureau of Disability Determination.  (Tr. 303-10.)  In summary, Dr. Levinthal indicated that Plaintiff "appears to suffer from inhibitions regarding relationships with other people of both sexes," and "has a germ phobia."  (Tr. 309.)  Dr. Levinthal further noted that "[d]epression is also present."  (Tr. 308.)  Dr. Levinthal diagnosed Plaintiff with "specific phobia, other type" and dysthymia;[2] indicated that psychological stressors included unemployment and unfavorably comparing herself to the vocational achievements of her three sisters and her father; and assigned Plaintiff a GAF score of 60.[3]  (Tr. 309-10.)

---

[2] Dysthymia is a mental condition with depressive symptoms.  *See* The Merck Manual 1538 (17th ed., centennial ed., 1999).

[3] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers.  *See Diagnostic and Statistical Manual of Mental Disorders*, *supra* note 1, at 34.

4

Dr. Levinthal assessed Plaintiff's "Four Work-Related Issues" as follows. Plaintiff's ability to relate to others, including fellow workers and supervisors, was not impaired; her ability to understand, remember, and follow instructions was mildly impaired because of her anxiety and depression; her ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks  was moderately impaired because of her anxiety, depression, and short term memory; and her ability to withstand the stress and pressure associated with day-to-day work activity was moderately impaired because of her anxiety and depression.  (Tr. 310.)

On June 28, 2006, state agency medical consultant William Benninger[4] performed a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment of Plaintiff.  (Tr. 311-28.)  Mr. Benninger assessed Plaintiff under listings 12.04 and 12.06 in his Psychiatric Review Technique and indicated the following.  Plaintiff was mildly limited in her ability to perform activities of daily living; moderately limited in her abilities to maintain social functioning, concentration, persistence, or pace; and had no episodes of decompensation.  (Tr. 325.)  In his mental RFC assessment, Mr. Benninger found that Plaintiff was no more than moderately limited in her mental functioning.  (*See* Tr. 311-12.)  On November 17, 2006, state agency consultative psychologist, Dr. Bruce Goldsmith, Ph.D., affirmed Mr. Benninger's assessment.  (Tr. 345.)

On October 16, 2006, Dr. Joaquin Tinio, M.D., authored a Daily Activities Questionnaire regarding Plaintiff and indicated the following.  (Tr. 333-35.)  Plaintiff had

---

[4]  The record does not clearly indicate Mr. Benninger's credentials.

presented to Dr. Tinio between January 2005 and August 2006.  (Tr. 333.)  Plaintiff did

not suffer overt symptoms from anxiety because her condition was "currently well-

controlled with medication."  (Tr. 333.)  Her abilities to understand, remember, and

follow directions and maintain attention were "good."  Further, Plaintiff "should react

normally" to the pressures involved in simple and routine, or repetitive, tasks.  (Tr. 334.)

In short, Dr. Tinio opined that Plaintiff had a "good response [to treatment] and

prognosis."  (Tr. 334.)

On October 23, 2006, Dr. Avtar Saran, M.D., authored a Daily Activities

Questionnaire regarding Plaintiff and indicated the following.  (Tr. 339-43.)  Dr. Saran

saw Plaintiff only once before authoring the Questionnaire—on May 23, 2006.  (Tr. 339,

343.)  Dr. Saran diagnosed Plaintiff with OCD and indicated that Plaintiff responded

poorly to treatment and had a poor prognosis.  (Tr. 340.)  Dr. Saran further indicated

that Plaintiff had a "poor" ability to sustain concentration and persistence and complete

tasks in a timely fashion; socially interact; adapt; and react to the pressures associated

with simple and routine or repetitive tasks.  (Tr. 340.)

On November 16, 2006, Ms. Flemming authored a Daily Activities Questionnaire

regarding Plaintiff for the Bureau of Disability Determination and indicated the following.

(Tr. 248.)  Plaintiff had presented to Ms. Martha Flemming, M.A., LPCC, LICDC, for

counseling between October 2004 and November 2006.  (Tr. 248.)  Plaintiff obsessively

worried about germs and contracting diseases from casual contact with others;

obsessively washed her hands; and sometimes suffered bouts of hyperventilation,

chest pain, and insomnia.  (Tr. 248.)  She had average intelligence and had no difficulty

with concentration or memory.  (Tr. 248.)  Her insight and judgment were "minimal"

6

pertaining to her compulsions, but she exhibited no addictive behavior or aggression. (Tr. 248.)  She suffered OCD and a "schizotypal personality disorder."  (Tr. 249.)  She had an average ability to understand, remember, and follow directions; a low to moderate, or otherwise average, ability to maintain attention; and a moderate ability to sustain concentration and persistence to complete tasks in a timely fashion.  (Tr. 249.)  However, she had poor social skills; was uncomfortable around men; had difficulty identifying the needs of others; was egocentric in conversation; and did not cope well with change.  (Tr. 249.)  If a work setting were "very low stress," Plaintiff "would handle [it] OK."  (Tr. 249.)

On October 24, 2008, Ms. Flemming authored a medical source statement and indicated the following.  (Tr. 375-76.)  Plaintiff had a "poor" or no ability to deal with the public and work stress.  (Tr. 375-76.)  She had a "fair" ability to follow rules; use judgment; respond appropriately to changes in routine settings; maintain regular attendance and be punctual within customary tolerances; relate to coworkers; interact with supervisors; complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; socialize; relate predictably in social situations; and manage funds and schedules.  (Tr. 375-76.)  She otherwise had "good" or "very good" functioning.  (Tr. 375-76.)  Ms. Flemming further explained as follows:

> [Plaintiff's] OCD symptoms would prevent her from retaining a job for a long period of time.  Anxiety and fearfulness are triggered by average contact with the public, and she does not respond well to conflict and stress, nor to changes in routine.

(Tr. 375.)

7

On January 19, 2009, Plaintiff presented to Dr. Saran with a chief complaint of anxiety.  (Tr. 393.)  Dr. Saran indicated the following.  Plaintiff reported such symptoms as excessive, uncontrollable worrying; moderate to severe obsessions regarding "contamination"; compulsion regarding washing her hands; and concern about  religious right and wrong.  (Tr. 393.)  Plaintiff also did not use public restrooms.  (Tr. 393.)  Dr. Saran diagnosed Plaintiff with OCD and assigned Plaintiff a GAF score of 70.[5]  (Tr. 394.)  Dr. Saran also authored a medical source statement and indicated the following.  Plaintiff had a "poor" ability to maintain attention and concentration for extended periods of 2 hour segments; respond appropriately to changes in routine settings; function independently without special supervision; deal with work stress; complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; socialize; behave in an emotionally stable manner; and relate predictably in social settings.  (Tr. 399-400.)  She had between a "fair" and "poor" ability to deal with the public and relate to co-workers.  (Tr. 399.)  She had a "fair" ability in all other areas.  (Tr. 399-400.)

Also on January 19, 2009, Ms. Flemming authored a medical source statement and indicated the following.  (Tr. 397-98.)  Plaintiff had a "poor" ability to maintain attention and concentration for extended periods of 2 hour segments; respond

---

[5]  A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships.  *See Diagnostic and Statistical Manual of Mental Disorders*, *supra* note 1, at 34.

appropriately to changes in routine settings; maintain regular attendant and be punctual within customary tolerances; deal with the public; deal with work stress; complete a normal workday and work week without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember, and carry out complex job instructions; socialize; behave in an emotionally stable manner; and relate predictably in social situations.  (Tr. 397-98.)  She had a "fair" ability to follow work rules; use judgment; deal with the public; interact with supervisors; function independently without special supervision; work in coordination with or proximity to others without being unduly distracted or distracting; understand, remember, and carry out detailed, but not complex, job instructions;  and manage funds and schedules.  (Tr. 397-98.)  She otherwise had "good" functioning. (Tr. 397-98.)  Ms. Flemming explained that Plaintiff's generalized anxiety disorder and OCD caused these limitations, and that Plaintiff's schizotypal personality disorder "increases social difficulties."  (Tr. 398.)

## 2.    Medical Evidence Submitted to the Appeals Council

On June 17, 2009, Dr. Diane C. Berie, M.D., authored a letter in support of Plaintiff's claim of disability.  (Tr. 402-08.)  Dr. Berie indicated that she saw Plaintiff a total of four times and interviewed Plaintiff's mother before she authored her letter.  (Tr. 402.)  There is no supporting documentation from each individual occasion on which Plaintiff presented to Dr. Berie; and much of Dr. Berie's letter recites Plaintiff's personal and medical history as reported by Plaintiff and Plaintiff's mother.  (*See* Tr. 402-07.)  Dr. Berie indicated the following in her letter.

9

Plaintiff had presented to Dr. Berie on April 24, 2009, for a second opinion on her OCD because she believed her medication was ineffective.  (Tr. 402.)  Plaintiff reported that she had been taking the anti-depressant Paroxetine but continued to have "strong fears and obsessions about germs."  (Tr. 402, 403.)  Plaintiff also reported that she felt compelled to clean anything that was touched by others; used only her personal bathroom; wore long sleeved shirts and long pants; would not walk barefoot anywhere but in her own room; and feared ghosts, dying, being in an accident, going blind, and becoming a quadriplegic.  (Tr. 403.)

Dr. Berie described Plaintiff's presentation on one occasion as follows.  Plaintiff was cooperative and pleasant, but she seemed to avoid eye contact and squinted her eyes in a "tic-like" fashion.  (Tr. 404.)  She took her shoes off and tucked them under herself while she sat on Dr. Berie's couch, kept her hands crossed on her arms, and limited what she touched.  (Tr. 404.)  Her voice was high-pitched and child-like, and it lacked inflection.  (Tr. 404.)  Plaintiff reported her mood as "anxious," but Dr. Berie could not discern Plaintiff's affect from Plaintiff's facial expressions or speech.  (Tr. 404.)  Plaintiff's thoughts were "quite circumstantial and at times tangential with lots of worries and fears."  (Tr. 404.)  She often was distracted and needed to be refocused. (Tr. 404-05.)  Her historical knowledge was "phenomenal," but her short-term memory was "mildly impaired."  (Tr. 405.)  Here insight and judgment were "fairly good."  (Tr. 405.)

Dr. Berie also indicated that, on another occasion, Plaintiff reported an improvement in her concentration after she took Concerta.  (Tr. 407.)  However, Dr. Berie noted that Plaintiff's thoughts remained fairly tangential and "distractible"; and that

10

Plaintiff "fidgeted with her hands and rocked back and forth on [the] couch."  (Tr. 407.)

Dr. Berie opined as to Plaintiff's condition as follows:

> In my professional opinion, I believe [Plaintiff's] case is complex, consisting of the diagnoses of Obsessive Compulsive Disorder of moderate severity, along with Asperger's Disorder and symptoms of ADHD which do not quite meet [the] full criteria of ADHD, thus, ADHD NOS.  She also has a variety of worries and fears . . . that I would classify as Anxiety NOS. . . .  Any one of [Plaintiff's] diagnoses would probably not be enough to deem her as significantly unemployable, but the combination of these conditions certainly limits her ability to be consistently employed.

(Tr. 408.)

### C.  Hearing Testimony

#### 1.  Plaintiff's Testimony

Plaintiff testified at her hearing as follows.  She used to work as an historical interpreter and tour guide narrator in Washington, D.C., but had to discontinue that work because the number of tourists declined after September 11, 2001, her work shifts were cut, and she could not afford to remain in that region.  (Tr. 35.)  She returned to Cleveland and was able to obtain a job, but she was worried about whether she would be able to keep it—partly because of the poor economy, and partly because she had a difficult time interacting with people.  (*See* Tr. 35-36.)

As a tour guide narrator, she had always struggled to cope with people because she was the focus of attention and any complaints.  (Tr. 36.)  She feared that she would be "punished" by authority figures because of poor performance.  (Tr. 36.)  Her anxiety and fear had become worse over the years, and she now was "pretty much afraid of everything, even the world."  (Tr. 36-37.)

Plaintiff's anxiety sometimes caused chest pains or stomach aches.  (Tr. 38.)

11

She had trouble breathing when she had panic attacks.  (Tr. 38.)  Proximity to both men and women made her uncomfortable.  (Tr. 38-39.)  She used public restrooms only to wash herself.  (Tr. 39.)  She washed her hands up to 40 times a day, depending on how often she handled objects outside of her room.  (Tr. 39.)  Plaintiff had sanitary hand wipes at home and used them to clean everything that she brought into her house, but she did not carry sanitary hand wipes when she left her home.  (Tr. 37.)

Plaintiff obtained counseling from Ms. Martha Flemming "as needed, but usually every couple weeks."  (Tr. 39.)  She also had a psychiatrist,[6] but she saw him only "a couple times a year . . . to get prescriptions."  (Tr. 39.)  She took "Paratoxatene" for her anxiety, but she was not certain that it helped her because she still felt anxious.  (Tr. 40.)

### 2.    The VE's Testimony

The ALJ posed the following hypothetical to the VE:

> [W]e have a younger person with at least a high school education and no transferable skills, who can perform medium work with the following limitations; contact with the public is occasional.  Rule out retail sales.  I'm also ruling our past relevant work.  Contact with coworkers is occasional and nonconsequential [sic].  For example, team work or planning tasks as a group is not required.  May not be exposed to concentrated dust and must be allowed to wash hands at least three times per day or to use sanitary hand wipes every four hours or so.

(Tr. 41.)  The VE testified that such a person could perform other work as a food assembly worker (for which there were 850 jobs regionally and 280,000 jobs nationally); sorter (for which there were 690 jobs locally and 210,000 jobs nationally); and order clerk in the food and beverage industry (for which there were 850 jobs locally and

---

[6] Plaintiff did not state her psychiatrist's name.

245,000 jobs nationally).  (Tr. 41-42.)

Plaintiff's attorney asked the VE whether it would be a reasonable accommodation to provide Plaintiff with a restroom for only Plaintiff's use.  (Tr. 43.)  The VE responded that such an accommodation would not be reasonable.  (Tr. 43.)  Plaintiff's attorney further asked whether it would be a reasonable accommodation to permit a person to be off task at work for between 10 and 15 percent of the time.[7]  (Tr. 43-44.)  The VE responded that a person could be reasonably accommodated in an unskilled level two position if they were off task 10 percent of the time, but not if they were off task 15 percent of the time; and that, in a semi-skilled or skilled job it would not be an unreasonable accommodation to permit someone to be off task up to 15 percent of the time.  (Tr. 43-44.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981)*.  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient

---

[7] Plaintiff's attorney indicated that he wanted to ask the VE whether it would be a reasonable accommodation to permit someone to be off task 10 to 15 "based on [Plaintiff's] testimony that she wants to wash her hands every time she touches something," but the ALJ explained that Plaintiff did not so testify but rather testified that she had to wash her hands when she returned home.  (Tr. 43.)

13

must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

14

1.    The claimant met the insured status requirements of the Social Security Act through December 31, 2008.

2.    The claimant has not engaged in substantial gainful activity since August 31, 2003, the alleged onset date.

3.    The claimant has the severe impairments of obsessive-compulsive disorder (OCD) and dysthymia.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the Listed Impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work . . . except she cannot be exposed to concentrated dust; can have occasional contact with the general public (e.g., none of her past relevant work or retail sales); can have occasional contact with co-workers that is inconsequential (e.g., does not require teamwork or planning tasks as a group); and must be allowed during an 8-hour workday to either wash her  hands at least 3 times or use sanitary had wipes every 4 hours.

6.    The claimant is unable to perform any past relevant work.

. . . . .

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as  framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 31, 2003, through the date of this decision.

(Tr. 15-25.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.     The ALJ's Assessment of Plaintiff's Treating Psychiatrists**

Plaintiff contends that the ALJ improperly assessed the credibility of Dr. Smartnick and Dr. Saran and gave them less weight than Plaintiff's non-treating sources. For the following reasons, this assignment of error is not well taken.

16

Dr. Smartnick's opinions of Plaintiff's functional abilities are as follows:

- Plaintiff suffered mildly to moderately severe OCD;

- Plaintiff exhibited a GAF of between 45 and 50;

- Plaintiff suffered "significant anxiety and distress" associated with her OCD that "interferes with her concentration and her ability to function."

- Plaintiff had only a partial response to treatment;

- Plaintiff's anxiety was "to the extent that it interfere[d] with her ability to focus and attend enough to doing a job, and her symptoms would make her incapable of tolerating interaction with others or the work environment";

- Plaintiff was unable to be gainfully employed because of her significant ongoing residual obsessive-compulsive symptoms and the associated anxiety.

The ALJ generally gave Dr. Smartnick's opinions "significant weight" based on the length of his treatment relationship with Plaintiff, but not "controlling weight" because Dr. Smartnick's treatment notes contained unremarkable findings.  (Tr. 22.)  However, he gave Dr. Smartnick's opinion that Plaintiff was "unable to be gainfully employed" no weight because such an opinion is reserved for the Commissioner.  (Tr. 22.)  The ALJ ultimately limited Plaintiff, in relevant part, as follows:

[Plaintiff] can have occasional contact with the general public (e.g., none of her past relevant work or retail sales); can have occasional contact with co-workers that is inconsequential (e.g., does not require teamwork or planning tasks as a group); and must be allowed during an 8-hour workday to either wash her  hands at least 3 times or use sanitary had wipes every 4 hours.

The ALJ properly rejected Dr. Smartnick's opinion that Plaintiff was unable to be gainfully employed, as statements from any medical source that the claimant is "disabled" or "unable to work" are not medical opinions, but are rather comments on a determination reserved for the Commissioner and, therefore, not entitled to controlling

17

weight or special significance.  20 C.F.R. § 404.1527(e); S.S.R 96-5p, 1996 WL 374183, at *1 (1996); Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985).  Further, the ALJ's RFC is not inconsistent with Dr. Smartnick's opinions that Plaintiff suffered mildly to moderately severe OCD and significant anxiety and distress that interfered with her ability to focus.  Plaintiff fails to explain how the ALJ's RFC determination does not adequately reflect Dr. Smartnick's opinions.  Accordingly, this assignment of error as it relates to Dr. Smartnick is not well taken.

The ALJ gave Dr. Saran's January 2009 opinions "little weight" because "a multi-year gap separates [Dr. Saran] from [Plaintiff's] treatment."  (Tr. 23.)  Plaintiff contends that the ALJ's reason for giving Dr. Saran's January 2009 opinions little weight is invalid, and that the ALJ should have given those opinions more weight, because the record shows that Plaintiff consistently presented to Dr. Saran between October 2006 and January 2009:

> Dr. Saran reported that he first started treating Ms. Willis on May 23, 2006.  Ms. Willis testified that she primarily sees her counselor, but that she sees her psychiatrist a couple of times a year.  Dr. Saran then provided a patient note dated January 19, 2009.  This evidence confirms Dr. Saran as Plaintiff's treating psychiatrist and proves that his opinion deserves more than little weight.

(Pl.'s Br. 11-12) (internal citation omitted).  But the record is replete with medical sources, and Plaintiff never testified *which* psychiatrist she saw "a couple of times a year."  Indeed, the ALJ observed that Plaintiff's psychiatrist was "unnamed."  (Tr. 19.)  Further, Plaintiff has failed to cite any treatment notes from Dr. Saran in the record dated between October 2006 and January 2009.  In short, Plaintiff fails to provide a sufficient factual basis to conclude that the ALJ's reason for giving Dr. Saran's January

2009 opinion little weight is invalid.  Accordingly, this assignment of error as it relates to Dr. Saran is not well taken.

Finally, Plaintiff suggests without citation to any legal authority that reversal and remand are "important" because the ALJ gave more weight to Mr. Benninger's opinions than Plaintiff's treating psychiatrists' opinions, as there is no evidence that Mr. Benninger is a medical professional.  Indeed, Mr. Benninger's credentials are not provided on his psychiatric review technique and mental RFC assessment.  But Mr. Benninger's opinions were affirmed by a confirmed medical professional—Dr. Goldsmith, Ph.D.  Furthermore, the ALJ did not rest his decision upon only Mr. Benninger's opinions; he also considered and gave weight to the opinions of Dr. Tinio and Dr. Leventhal.  Plaintiff has not taken issue with the ALJ's assessment of their opinions.  In short, Plaintiff fails to provide an adequate basis to conclude that the ALJ's assessment of Dr. Benninger's opinions was defective or that any defect constitutes reversible error.  Accordingly, this assignment of error is not well taken.

## C.    The ALJ's Assessment of Plaintiff's Counselor

Plaintiff contends that the ALJ failed to assess the opinions of Plaintiff's counselor, Ms. Flemming, pursuant to Social Security Ruling 06-03p.  For the following reasons, the Court disagrees.

The purpose of Social Security Ruling 06-03p is "[t]o clarify how we consider opinions from sources who are not "acceptable medical sources."  S.S.R. 06-03p, 2006 WL 2329939, at *1 (S.S.A.).  Counselors, such as Ms. Flemming, are considered "other sources."  *See id.* at *1-2.  Information from "other sources" cannot establish the

19

existence of a medically determinable impairment; however, such information may be based on special knowledge of an individual and may provide insight into the severity of the individual's impairments and how they affect the individual's ability to function.  *Id.* Accordingly, "[a]lthough the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors *can be* applied to opinion evidence from 'other sources.'"  *Id.* at *4 (emphasis added).  These factors include:

- How long the source has known and how frequently the source has seen the individual;

- How consistent the opinion is with other evidence;

- The degree to which the source presents relevant evidence to support an opinion;

- How well the source explains the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

- Any other factors that tend to support or refute the opinion.

*Id.*

Plaintiff contends that "[t]he ALJ did not utilize any of the aforementioned factors in the analysis of Ms. Flemming's findings and opinions."  (Pl.'s Br. 14.)  The Court disagrees.  As an initial matter, the plain language of Social Security Ruling 06-03p does not mandate that an ALJ discuss all of the relevant factors, and Plaintiff fails to cite any legal authority in support of the proposition that an ALJ must do so.

Further, a review of the ALJ's opinion supports the conclusion that the ALJ considered the relevant factors under Social Security Ruling 06-03p.  The ALJ noted

that Ms. Flemming had a Master of Arts degree, and was a Licensed Professional

Clinical Counselor and Licensed Independent Chemical Dependency Counselor.  (*See*

Tr. 20.)  The ALJ rejected Ms. Flemming's diagnoses and medical source statements

because, as an "other source," she was "not eligible to make a medical source

statement."  (*See* Tr. 19-20.)  The ALJ then devoted an entire paragraph to a

discussion of Ms. Flemming's findings in her Daily Activities Questionnaire:

> Ms. Flemming . . . noted that she had provided mental healthcare from
> October 2004 to February 2006.  She noted that the claimant was compliant
> with treatment, which included individual counseling and medication, but that
> she was also resistant to change.  It was her impression that the claimant
> was detached from her emotions and confused about what she was feeling.
> There was also the lack of some basic conversational/interactive skills that
> interfered with her social functioning and her ability to maintain long-term
> employment. However, some progress was made in this area.   Ms.
> Flemming made observations of the claimant's behavior that are similar to
> the above symptoms. She also observed that the claimant had little
> motivation to change and that she was fairly content with her life except
> when her symptoms were aggravated by stressors. Because these
> statements are consistent with the record, they are deemed credible.

(Tr. 20.)  Plaintiff's contention that the ALJ failed to consider the factors set forth in

Social Security Ruling 06-03p is not supported by the record.  Accordingly, this

assignment of error is not well taken.

### D.      The ALJ's Hypothetical Question to the VE

At the fifth and final step of an ALJ's analysis, the ALJ must determine whether,

in light of the claimant's RFC, age, education, and past work experience, the claimant

can make an adjustment to other work.  20 C.F.R. § 404.1520(a)(4).  At this step, the

burden shifts to the Commissioner to prove the  existence of a significant number of

jobs in the national economy that a person with the claimant's limitations could perform.

21

*Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  To meet this burden, there must be a finding supported by substantial evidence that the claimant has the vocational qualifications to perform specific jobs.  *Workman* v. Comm'r of Soc. Sec., 105 F. App'x 794, 799 (6th Cir. 2004) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)).  Substantial evidence may be produced through reliance on the testimony of a VE in response to a hypothetical question, but only if the question accurately portrays the claimant's individual physical and mental impairments.  *Workman*, 105 F. App'x at 799 (quoting *Varley*, 820 F.2d at 779).

Plaintiff explains that "the ALJ recognized that [she] had an impairment that causes mental limitations including obsessions and compulsions regarding washing her hands up to 40 to 50 times a day, changing her clothes multiple times during the day, . . . not using public restroom[s, and] problems tolerating stress and the work environment."  (Pl.'s Br. 16.)  Plaintiff concludes that "the ALJ failed to pose a complete, proper hypothetical question to the vocational expert."  (Pl.'s Br. 17.)  But Plaintiff fails to explain what limitations the ALJ did not, and should have, included in his RFC determination.  Moreover, the ALJ included limitations in his hypothetical related to Plaintiff's mental impairments, and Plaintiff fails to explain how these limitations inaccurately portray her.

Hypothetical questions posed to the VE need only enumerate those physical and mental impairments that the ALJ finds supported by the medical evidence in the record.  *Miller v. Sec'y of Health & Human Servs.*, 895 F. 2d 1414 (Table), 1990 WL 10695, at *2 (6th Cir. Feb. 9, 1990) (citing *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir.1987)).

If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints. *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990).  To the extent that Plaintiff suggests that the ALJ should have included limitations related to Plaintiff's alleged need to wash her hands between 40 and 50 times a day and change her clothes multiple times during the day, inability to use public restrooms, and problems tolerating stress and the work environment, the ALJ found Plaintiff's testimony of these limitations not fully credible.  (Tr. 18-19.) Plaintiff has not taken issue with the ALJ's assessment of Plaintiff's credibility.  In short, Plaintiff has provided no basis to conclude that the ALJ's hypothetical to the VE inaccurately portrays Plaintiff's limitations.  Accordingly, this assignment of error is not well taken.

### E.  Whether Remand is Warranted for Consideration of New and Material Evidence

Plaintiff contends that remand is warranted pursuant to sentence six of 42 U.S.C § 405(g) to consider Dr. Berie's opinions, which Plaintiff obtained after the ALJ rendered his decision and submitted to the Appeals Council to no avail.[8]  For the following reasons, the Court finds that a sentence six remand is not warranted.

A "court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such

---

[8] When the Appeals Council considers new evidence but declines to review the application for disability benefits, that evidence may not be considered as part of the record for purposes of the substantial evidence review.  *Templeton v. Comm'r of Soc. Sec.*, 215 F. App'x 458, 463 (6th Cir. 2007).

evidence into the record in a prior proceeding.  42 U.S.C § 405(g); *see Foster v. Halter, 279 F.3d 348, 357 (6th Cir. 2001)*.  Evidence is "new" only if it was not in existence or available to the claimant at the time of the administrative proceeding.  *Foster*, 279 F.3d at 357.  Evidence is "material" only if there is a reasonable probability that the Commissioner would have reached a different conclusion on the claimant's disability claim if presented with the new evidence.  *Id.*  "Good cause" is shown  by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ.  *Id.*  The burden of showing that a remand is appropriate is on the claimant.  *Id.*

Plaintiff contends that Dr. Berie's opinions are new because they did not exist until after the ALJ rendered his decision.  (Pl.'s Br. 18.)  She contends that they are material because "there is a reasonable probability that the ALJ would have reached a different disposition of [her] disability claim if presented with the new evidence."  (Pl.'s Br. 18.)  And she contends that she has good cause for failing to acquire and present Dr. Berie's opinions for inclusion in the hearing before the ALJ because "she did not realize that the ALJ would not assign appropriate weight to her existing treating psychiatrist."  (Pl.'s Br. 18.)

Plaintiff has not explained how Dr. Berie's opinions are material; rather, she has merely recited the standard for determining materiality.  Further, Plaintiff's explanation for failing to obtain Dr. Berie's opinions in a timely manner is a *non sequitur*.  If Plaintiff believed the ALJ had failed to assign "appropriate" weight to Plaintiff's treating psychiatrist, the issue before the Appeals Council would have been whether the ALJ

24

failed to assess Plaintiff's treating psychiatrist properly; additional evidence from a new treating source would be irrelevant to that issue.  Accordingly, Plaintiff has failed to show that remand pursuant to sentence six of 42 U.S.C § 405(g) is warranted.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: March 2, 2012